# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 10CR3044 WQH |
| Plaintiff, | |
| vs. | |
| (10) Jesus Quinonez MARQUEZ, | ORDER |
| Defendants. | |

HAYES, Judge:

The matter before the Court is the motion for letters rogatory or to compel the government to use the Mutual Legal Assistance Treaty; and to reconsider obtaining testimony of deposition witnesses through letters rogatory or MLAT filed by the Defendant Jesus Quinonez Marquez. (ECF No. 1383-1 and 1383-2).

## BACKGROUND FACTS

On July 29, 2010, the federal grand jury returned a one-count indictment charging forty-three defendants with conspiring to conduct enterprise affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d). The indictment alleged that the defendants and "others known and unknown to the grand jury, were members and associates of an organization known as the 'Fernando Sanchez Organization', whose members engaged in, among other things, murder, conspiracy to commit murder, attempted murder, kidnaping, conspiracy to kidnap, attempted kidnaping, robbery, conspiracy to commit robbery, attempted robbery, importation of controlled substances into the United States from Mexico, conspiracy

to import controlled substances into the United States from Mexico, distribution of controlled substances, conspiracy to distribute controlled substances, money laundering and conspiracy to launder money." (ECF No. 82 at 3-4).

On April 28, 2011, the grand jury returned a two-count superseding indictment. (ECF No. 644). The superseding indictment charged the forty-three defendants in Count 1 with conspiring to conduct enterprise affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d), as charged in the original indictment. The superseding indictment charged certain defendants, not including Defendant Quinonez, in Count 2 with conspiring to distribute cocaine, marijuana and methamphetamine.[1]

The Superseding Indictment alleged as follows:

> <u>Corrupt Foreign Law Enforcement Officials</u>: Defendants JESUS QUINONEZ MARQUEZ, aka Rinon, JOSE ANTONIO ORTEGA NUNO, EDGAR LOPEZ DE-ANDA DAHER, aka Pollito, JOSE ALEJANDRO FLORES MEZA, aka, Shakira, were either former or current law enforcement officers working for the FSO. The defendants used their positions within the Mexican law enforcement community to obtain and disseminate confidential law enforcement information to the FSO, target rivals of the FSO for arrest, obtain confessions from rival organization members to gain intelligence about those organizations, bribe judicial and law enforcement authorities to secure release of arrested FSO members, to shift responsibility for violent activities from the FSO to rival organizations (both legally and in stories generated by the media), and to obtain law enforcement employee information for FSO's use in targeting law enforcement officers taking actions adverse to the interests of the Enterprise.

(ECF No. 644 at 6-7). The Superseding Indictment charged, in part, the following overt acts in furtherance of the racketeering conspiracy in Count 1, with respect to Defendant Quinonez:

> On or about March 16, 2010, defendant JOSE ALFREDO NAJERA GIL told defendant JESUS QUINONEZ MARQUEZ that he was going to get a new phone number for Marquez's phone, but that despite that change, Marquez would not lose his "agenda," that is, his contact list.
>
> On or about March 17, 2010, defendant JESUS QUINONEZ MARQUEZ provided defendant JOSE ALFREDO NAJERA GIL with information about a triple homicide which occurred in "Las Brisas," a neighborhood in Tijuana, Mexico.
>
> On or about March 23, 2010, defendant JESUS QUINONEZ MARQUEZ informed defendant JOSE ALFREDO NAJERA GIL that he (MARQUEZ) was "waiting for things to get better" so that NAJERA could buy him (MARQUEZ)

---

[1] On December 22, 2011, a second superseding indictment was filed which added charges against Defendants Raul Moreno and Jonathan Valle. All relevant portions of the indictment against Defendant Quinonez remained the same. (ECF No. 1193).

the apartment, to which NAJERA responded that there would be "more money," "things would get better," and that MARQUEZ should "not worry."

On or about March 25, 2010, at the direction of defendants JOSE ALFREDO NAJERA GIL and RUBEN DARIO CASTRO PEREZ, "Panchito" and other unidentified individuals shot and killed Efrain Alvarez Gonzalez and Abel Joatan Gonzalez in the El Florido neighborhood of Tijuana, Mexico.

On or about March 25, 2010, defendant RUBEN DARIO CASTRO PEREZ instructed defendant JOSE ALFREDO NAJERA GIL to contact defendant JESUS QUINONEZ MARQUEZ and have MARQUEZ "spread the rumor and make a mess of things, just as if 'they' (Efrain Alvarez Gonzalez and Abel Joatan Gonzalez) were bad guys."

On or about March 25, 2010, defendant JORGE ALBERTO RAMERIZ PONCE informed defendant JOSE ALFREDO NAJERA GIL that "the lady" (Marisol Fuerte Aquinon) had been located and "they cashed her check," that is, Aguinon had been killed.

On or about March 27, 2010, defendant JESUS QUINONEZ MARQUEZ informed defendant JOSE ALFREDO NAJERA GIL that he (MARQUEZ) had been tasked by defendant RUBEN DARIO CASTRO PEREZ with making the murders of Efrain Alvarez Gonzalez and Abel Joatan Gonzalez appear to have been committed by members of a rival organization.

On or about March 27, 2010, defendant JOSE ALFREDO NAJERA GIL informed defendant JESUS QUINONEZ MARQUEZ that he would check with defendant RUBEN DARIO CASTRO PEREZ and confirm that there would be "motivation," that is, a cash payment, if Marquez made the murders of Efrain Alvarez Gonzalez and Abel Joatan Gonzalez appear to have been committed by members of a rival organization.

On or about June 6, 2010, defendant JOSE ALFREDO NAJERA GIL asked defendant JESUS QUINONEZ MARQUEZ to "help out" with the situation involving "Gabby," who Najera stated was being targeted by Mexican law enforcement officers investigating the murder of Marisol Fuerte Aquinon on March 25, 2010, in Tijuana, Mexico.

(ECF No. 644 at 33-38, 53).

On August 29, 2011, Defendant Quinonez moved the Court pursuant to Rule 15 of the Federal Rules of Criminal Procedure for an order to depose three unnamed witnesses. (ECF No. 872). Defendant Quinonez subsequently filed a Proffer in Support of Motion for Depositions seeking to take the depositions of Jose Rene Tovar Sanchez and Rigoberto Ruiz Murillo in their respective cities of residence in Mexico. (ECF No. 1008).[2] The Proffer included the declaration of each witness outlining the substance of the testimony, and the

---

[2] Defendant withdrew the request for the deposition of the third potential witness. (ECF No. 990 at 14).

declaration of counsel for Defendant Quinonez stating that each witness advised defense counsel that the witness would not come to the United States to testify, even if served with a subpoena. (ECF No. 1008-3 at 3).

On January 10, 2012, this Court denied the Defendant's motion for depositions. (ECF No. 1267).

**CONTENTIONS OF THE PARTIES**

Defendant Quinonez asserts that he did not actively assist Defendant Najera-Gil and Defendant Castro Perez in their illegal endeavors but repeatedly lied to them on the recorded conversations in order to gather information about pending investigations. In order to prove the government-authorized nature of his relationship with Najera-Gil, Defendant Quinonez seeks the testimony of Rommel Moreno Manjarrez, Attorney General for the State of Baja. Defendant Quinonez contends that Moreno Manjarrez will confirm "that he had solicited the assistance of Mr. QUINONEZ in the Rafael Fimbres Hernandez murder investigation in 2009 and that he had expressly authorized Mr. QUINONEZ to establish a relationship with, and use an informant." (ECF No. 1383-1 at 4). Defendant Quinonez asserts that Najera-Gil was an authorized informant for the Attorney General's Office and that Moreno Manjarrez is the only witness who has been able to confirm this fact. Defendant Quinonez states: "on January 17, 2012, Mr. Moreno Manjarrez stated that he had no intention of meeting with or helping the defense lawyers for Mr. QUINONEZ by testifying at trial, notwithstanding his earlier statement confirming that he had authorized Mr. QUINONEZ to use an informant." *Id.*

Defendant Quinonez requests that the Court order the issuance of letters rogatory, or alternatively, order the Government to utilize the Mutual Legal Assistance Treaty (MLAT) between Mexico and the United States to secure the testimony of Moreno Manjarrez and others.

The Government states no objection to the request for the issuance of letters rogatory.[3] The Government opposes the request to compel the prosecution to utilize the MLAT to obtain

---

[3] The Government states that the execution letters rogatory may take a year or more and opposes any further continuance of the trial based upon the issuance of letters rogatory.

evidence located in Mexico on his behalf. The Government contends that the express language of the MLAT makes it clear that it is not available for use by private parties, such as individual defendants. The Government contends that the Defendant has no constitutional entitlement to gather foreign evidence by compelling MLAT requests.

Letters Rogatory

The U.S. Code provides: "The Department of State has power, directly, or through suitable channels to receive a letter rogatory issued, or request made, by a tribunal in the United States, to transmit it to the foreign or international tribunal officer, or agency to whom it is addressed, and to receive and return it after execution." 28 U.S.C. § 1781(a)(2). There are no facts in this record which would support the conclusion that letters rogatory could be successfully secured prior to the current June trial date. However, the Defendant's unopposed request for the issuance of letters rogatory is granted.

Mutual Legal Assistance Treaty

The MLAT is a bilateral treaty between the United States and Mexico whose purpose is to "counter more effectively trans-border criminal activities." Mutual Legal Assistance Cooperation Treaty with Mexico, U.S.-Mex., Dec. 9, 1987, S. Treaty Doc. No. 100-13, 1987 WL 890783 at 1. The MLAT provides a broad range of cooperation in criminal matters including but not limited to the taking of testimony or statements of witnesses and the provision of documents, records and evidence. *Id*. The MLAT provides that the government of one nation may request the assistance of the other nation on a broad range of matters related to the "investigation, prosecution, and prevention of crimes, and in proceedings related to criminal matters." "The Treaty is intended solely for mutual legal assistance between the Parties." *Id*. at Art. I, Clause 5. The MLAT states: "The provisions of this Treaty shall not give rise to a right on the part of any private person to obtain, suppress, or exclude any evidence, or to impede the execution of a request." *Id*.

The express language of the MLAT states that the treaty is not available for use by private persons to obtain evidence. Defendant has no direct rights under the MLAT. There are no facts in this record to support the assertion that the due process clause of the United States Constitution requires an order compelling the Government to use the MLAT to obtain

the evidence.  The Court further concludes that the Sixth Amendment right to compulsory process extends only to areas within the territorial power of the United States and does not require an order compelling the Government to use the MLAT to obtain evidence on behalf of the Defendant in Mexico.

IT IS HEREBY ORDERED that motion (ECF No. 1383-1) is granted as to issuance of letters rogatory, and denied as to an order compelling the government to use Mutual Legal Assistance Treaty; and the motion (ECF No. 1383-2) to reconsider obtaining testimony of deposition witnesses is granted as to letters rogatory and denied as to an order compelling evidence through MLAT.

DATED:  February 2, 2012

**WILLIAM Q. HAYES**
United States District Judge